**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **CHRISTOPHER PROUDFOOT,** | : | **CIVIL ACTION NO. 1:13-CV-1650** |
| | : | |
| **Plaintiff** | : | **(Chief Judge Conner)** |
| | : | |
| **v.** | : | |
| | : | |
| **ARNOLD LOGISTICS, LLC,** | : | |
| | : | |
| **Defendant** | : | |

**<u>MEMORANDUM</u>**

Presently before the court in the above-captioned matter is the motion (Doc. 22) pursuant to Federal Rule of Civil Procedure 56 filed by defendant Arnold Logistics, LLC ("Arnold Logistics").  Arnold Logistics seeks summary judgment as to both claims asserted by plaintiff Christopher Proudfoot ("Proudfoot"), a former employee who alleges that Arnold Logistics discriminated and retaliated against him in violation of the Americans with Disabilities Act ("ADA").  42 U.S.C. § 12101 *et seq*.  For the reasons that follow, the court will grant the motion.

I.   <u>**Factual Background & Procedural History**</u>[1]

On June 21, 2011, Proudfoot began working as a sanitation laborer at Arnold Logistics' distribution facility in Mechanicsburg, Pennsylvania.  (Doc. 24 ¶¶ 4-5; Doc. 31 ¶¶ 4-5).  In this role, Proudfoot was responsible for sweeping the building and parking lot, picking up trash inside and outside of the building, and checking product aisles for signs of damage and for dangerous conditions.  (Doc. 24 ¶ 6; Doc. 31 ¶ 6).  Warehouse manager Roger Danner ("Danner") supervised Proudfoot.

---

[1] To the extent facts are undisputed or supported by uncontroverted record evidence, the court cites directly to the parties' statements of material facts.

(Doc. 24 ¶ 7; Doc. 31 ¶ 7).  According to Proudfoot, Danner expressed a high opinion of Proudfoot's work performance.  (Doc. 24 ¶ 8; Doc. 31 ¶ 8; Doc. 30-2, Proudfoot Dep. 17:20-18:3, Oct. 31, 2013 ("Proudfoot Dep.")).

In his complaint, Proudfoot alleges that he suffers from Adult Separation Anxiety Disorder and from a learning disability that adversely affects his reading comprehension skills.  (Doc. 1 ¶¶ 20-21; see Doc. 24 ¶ 9; Doc. 31 ¶ 9).  Specifically, Proudfoot testified in his deposition that, due to his learning disability, he "ha[s] trouble comprehending at times" and has difficulty "understand[ing] people's body language." (Proudfoot Dep. 23:14-23:18).  Proudfoot did not inform Arnold Logistics of these disabilities when he was hired, nor did he request accommodations for these disabilities at any point during the course of his employment.  (Doc. 24 ¶¶ 10-11; see Doc. 30-3, Danner Dep. 25:13-25:16, Feb. 17, 2014 ("Danner Dep.")). Proudfoot did, however, inform Danner within two months of his start date that he suffered from claustrophobia, at which point Danner altered Proudfoot's work assignments accordingly.  (Doc. 24 ¶ 12; Doc. 31 ¶ 12; Danner Dep. 25:17-26:1).

Additionally, Proudfoot testified that he "received a lot of psychological abuse" from general manager Mike Dobbs ("Dobbs").  (Proudfoot Dep. 16:13-16:14; see also Doc. 31 ¶¶ 41-42).  He asserted that Dobbs regularly addressed him as "dumbass" and "retard."  (Proudfoot Dep. 59:7-59:13; see also Doc. 31 ¶¶ 41-42). Proudfoot also testified that his co-workers teased him regularly, for example, by giving him a falsely labeled Valentine's Day card, communicating with him online using a fake female identity, and taunting him with insults such as, "[D]on't forget your car seat." (Proudfoot Dep. 49:15-50:22, 52:17-54:6, 59:1-59:6; see also Doc. 31

¶ 40).  Co-worker Virginia Haas testified in her deposition that she and many of the other employees at Arnold Logistics viewed Proudfoot as a "little weird" and that she thought there was "something wrong with him."  (Doc. 30-8, Haas Dep. 17:10-17:17, Feb. 17, 2014; Doc. 31 ¶¶ 36-37).  Proudfoot relies upon the preceding examples in support of his contention that his co-workers regarded him as disabled.  (Doc. 31 ¶¶ 36-37; see also id. ¶ 14).

On February 28, 2012, Proudfoot's co-worker, Lindsay Haskins ("Haskins"), reported to Danner that as she gathered with other staff members for a meeting, Proudfoot approached her, spread his arms out, and knelt beside her, motioning as if he was going to hug her.  (Doc. 24 ¶ 14; Doc. 31 ¶ 14; Doc. 30-4, Haskins Dep. Ex. B at 1, Feb. 17, 2014 ("Haskins Dep.") (Haskins's written report)).  At Danner's request, Haskins and Proudfoot each prepared written reports of the incident.  (Doc. 24 ¶¶ 15, 17; Doc. 31 ¶¶ 15, 17; see Haskins Dep. Ex. B at 1(Haskins's written report); Proudfoot Dep. Ex. 1 at 1 (Proudfoot's written report)).  According to Proudfoot, Danner warned that he would be terminated if he refused to do so.  (Doc. 31 ¶ 17; Proudfoot Dep. 21:11-21:21).

In his written statement, dated February 28, 2012, Proudfoot averred that he has a learning disorder.  (Doc. 24 ¶ 18; Doc. 31 ¶ 18; Proudfoot Dep. Ex. 1 at 1).  Specifically, he wrote: "I have a learning disorder but I still do my best to learn."  (Proudfoot Dep. Ex. 1 at 1).  On March 12, 2012, Proudfoot met with Danner and Human Resources ("HR") manager Sharon Kay ("Kay") for approximately two to three minutes to discuss the incident involving Haskins.  (Doc. 24 ¶ 20; Doc. 31 ¶ 20; Proudfoot Dep. 24:12-25:12).  During this meeting, Kay questioned Proudfoot and

3

reviewed Proudfoot's and Haskins's written statements. (Doc. 31 ¶ 20; Proudfoot Dep. 25:13-26:7). After the meeting, neither Danner nor Kay contacted Proudfoot again regarding the incident involving Haskins. (Doc. 31 ¶ 20; Proudfoot Dep. 26:8-26:18).

On March 14, 2012, Proudfoot's co-worker, Jeff Cooper ("Cooper"), also a sanitation laborer, approached Danner. (Doc. 24 ¶¶ 21-22; Doc. 31 ¶¶ 21-22). Cooper reported that Proudfoot "was making threats against" Dobbs. (Doc. 24 ¶ 23; Doc. 31 ¶ 23). In Danner's words, "[Cooper had] thought about it and if something came from what he knew, he would feel bad that he didn't act on it." (Danner Dep. 22:19-22:24). Danner immediately contacted Kay, who instructed that Cooper and Proudfoot draft written statements regarding Cooper's allegations. (Doc. 24 ¶¶ 24-25; Doc. 31 ¶¶ 24-25). Cooper and Proudfoot subsequently prepared written statements describing the incident. (Doc. 24 ¶ 26; Doc. 31 ¶ 26). Cooper's statement, dated March 14, 2012, reads as follows:

> Yesterday morning Chris Proudfoot told me that he was tired of Mike Dobbs. And said that he was going to get messed up if he didn't leave "me" alone. I said then do it and stop talking about it. He said, "I'm not going to do it. I'll have someone else do it."
>
> Then later about 2:50 p.m. he told me that if Mike Dobbs doesn't "leave me alone I'm going to jump on him" and you will have to pull me off.
>
> This is what I was told and I will stand by it.

(Danner Dep. Ex. D at 1). Proudfoot's statement, also dated March 14, 2014, reads as follows:

Mike Dobbs – at times tends to get on my nerves!  Yes he is a boss!  But the manner in which he conducts himself is not professional.  It has been said by Jeff [Cooper], to avoid Mike Dobbs.

Despite that and Mike Dobbs stating he is not my boss and in a rude and arrogant tone, [h]ow can you go to Mr. Mike Dobbs.

Then with Jeff [Cooper] ("aka" "Mr. Kissbutt"), I simply said that Mike Dobbs is getting on my nerves and he is not easy to talk to!

It's simple.  I am tired of the teasing and harassment and I request for it to stop!!

(Proudfoot Dep. Ex. 2 at 1).

On March 15, 2012, Proudfoot, Danner, and Kay met for approximately thirty minutes to discuss Cooper's allegations.  (Doc. 24 ¶ 27; Doc. 31 ¶ 27; Danner Dep. 14:2-14:3; Doc. 30-6, Kay Dep. Ex. E at 1, Feb. 17, 2014 ("Kay Dep.") (Kay's interview notes)).  Proudfoot denied that he had threatened to arrange for someone to harm Dobbs.  (Kay Dep. Ex. E at 2 (Kay's interview notes)).  Kay then asked him to describe the teasing and harassment he reported in his written statement.  (Doc. 24 ¶ 32; Doc. 31 ¶ 32; Kay Dep. 18:22-19:25).  According to Kay, Proudfoot asserted that he was "busted by a variety of people" and that his co-workers would move trash cans during his shift, but he was otherwise unable to name specific co-workers or to provide further examples of harassment.  (Doc. 24 ¶ 33; Doc. 31 ¶ 33; Kay Dep. 19:8-19:19; Kay Dep. Ex. E at 2 (Kay's interview notes)).

After the meeting, Kay and Danner jointly made the decision to terminate Proudfoot's employment.  (Doc. 24 ¶ 27; Doc. 31 ¶ 27; Doc. 34 ¶¶ 2-3).  Specifically, Danner testified that they both provided "equal input," (Danner Dep. 12:5-12:10), and Kay testified that while "it was a collaborative decision," she made the final

determination.  (Kay Dep. 9:16-9:23).  On March 16, 2012, Kay and Danner met with Proudfoot to inform him that he was being discharged as a result of Cooper's accusations.  (Proudfoot Dep. 36:13-38:2).

In his deposition, Proudfoot testified that he did not threaten Dobbs.  (Doc. 31 ¶ 28; Proudfoot Dep. 28:19-29:24, 30:14-31:10).  Proudfoot explained that he did have a conversation with Cooper regarding Dobbs, wherein he merely speculated that Dobbs might say something to the wrong person on the wrong day.  (Doc. 24 ¶¶ 28-29; Proudfoot Dep. 30:1-30:11).  Although Proudfoot admitted to complaining about Dobbs, he testified that when Cooper suggested that Proudfoot "go do something about it," he responded, "It's not my job to do that.  My job is to clean."  (Doc. 24 ¶ 30; Doc. 31 ¶ 30; Proudfoot Dep. 31:11-33:14).  With respect to his employment record generally, Proudfoot testified that he received no disciplinary write-ups related to work performance during his employment at Arnold Logistics.  (Doc. 24 ¶ 13; Doc. 31 ¶ 13; Doc. 34 ¶ 1; Proudfoot Dep. 16:6-17:11).

Kay testified that Proudfoot was terminated exclusively because of "the incident where he threatened Mr. Dobbs based on a zero tolerance policy," (Doc. 24 ¶¶ 27, 34; Doc. 31 ¶¶ 27, 34; Kay Dep. 11:3-11:8), and Danner confirmed that Proudfoot's "threat of violence" was the only reason that Arnold Logistics elected to terminate Proudfoot's employment.  (Danner Dep. 14:15-14:21).  The relevant company policy prohibits "fighting or threatening violence in the workplace" and states that "[e]mployees who break work rules such as these may be subject to disciplinary action, up to and including termination of employment."  (See Kay Dep. Ex. G at 1).

In addition, Kay expressly stated in her deposition that the February 28, 2011 incident with Haskins was not a factor in Arnold Logistics' decision to terminate Proudfoot's employment.  (Kay Dep. 13:15-13:17; <u>see</u> Doc. 31 ¶¶ 27, 38).  Proudfoot contends, however, that Arnold Logistics did consider the incident involving Haskins when making its final decision.  (Doc. 31 ¶¶ 27, 38).  In support of this assertion, Proudfoot points to Arnold Logistics' September 27, 2012 letter to the Pennsylvania Human Relations Commission ("PHRC"), written in response to Proudfoot's complaint of discrimination.  (<u>Id.</u>; <u>see</u> Doc. 30-5, Arnold Logistics' Letter to Pennsylvania Human Relations Commission, Sept. 27, 2012 ("Letter to PHRC")).  Therein, Arnold Logistics states that it "took [the incident involving Haskins] into account" when making its decision to terminate Proudfoot's employment.  (Letter to PHRC at 4).  Moreover, in Proudfoot's discharge letter, Arnold Logistics represented that the threats reported by Cooper "combined with the recent situation in which [Proudfoot] made a female warehouse worker uncomfortable led to the . . . decision to end the employment relationship."  (Kay Dep. Ex. J at 3).  Arnold Logistics avers that it previously terminated a non-disabled warehouse employee for threatening behavior; on September 2, 2011, Damien Tippett was discharged for being loud and disrespectful towards co-workers and for "swinging a plank" while threatening to break someone's jaw.  (Doc. 24 ¶ 35; Letter to PHRC at 5; Letter to PHRC Ex. H at 1 (Damien Tippet's discharge letter)).

Proudfoot timely filed written charges of discrimination with the Equal Employment Opportunity Commission ("EEOC") and with the PHRC.  (Doc. 1 ¶¶ 13-14; Doc. 7 ¶¶ 13-14).  The parties do not dispute that Proudfoot has satisfied the

procedural and administrative requirements for proceeding with an action under the ADA.  (Doc. 1 ¶ 13; Doc. 7 ¶ 13).

Proudfoot commenced this action (Doc. 1) on June 19, 2013, advancing claims of discrimination and retaliation under the ADA.  42 U.S.C. § 12101 *et seq*.  Arnold Logistics answered (Doc. 7) the complaint on July 18, 2013, denying all allegations. After a period of discovery, Arnold Logistics moved for summary judgment (Doc. 22), asserting that both of Proudfoot's claims fail for lack of evidence that Arnold Logistics' proffered nondiscriminatory reason for terminating Proudfoot's employment is pretext.  Arnold Logistics' motion was accompanied by a supporting brief (Doc. 23) and a statement of material facts (Doc. 24).  Proudfoot filed opposition papers (Doc. 30) and a responsive counter-statement of material facts (Doc. 31).  Arnold Logistics responded with a reply brief (Doc. 32) and a supplemental statement of material facts (Doc. 34).  The motion has been fully briefed and is ripe for disposition.

## II.   <u>Standard of Review</u>

Through summary adjudication the court may dispose of those claims that do not present a "genuine issue as to any material fact" and for which a jury trial would be an empty and unnecessary formality.  <u>See</u> Fed. R. Civ. P. 56(a).  The burden of proof is upon the non-moving party to come forth with "affirmative evidence, beyond the allegations of the pleadings," in support of its right to relief. <u>Pappas v. City of Lebanon</u>, 331 F. Supp. 2d 311, 315 (M.D. Pa. 2004); Fed. R. Civ. P. 56(e); <u>see</u> <u>also</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986).  This evidence must be adequate, as a matter of law, to sustain a judgment in favor of the non-

moving party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-57 (1986);

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-89 (1986); see

also FED. R. CIV. P. 56(a), (e).  Only if this threshold is met may the cause of action

proceed.  Pappas, 331 F. Supp. 2d at 315.

## III.   Discussion

Proudfoot alleges that Arnold Logistics discriminated against him on the

basis of disability and retaliated against him for complaining to HR regarding

harassment from his co-workers.  The court will address these claims *seriatim*.

### A.   Disability Discrimination

The ADA prohibits an employer from discriminating "against a qualified

individual with a disability because of the disability . . . in regard to job application

procedures, the hiring, advancement, or discharge of employees, employee

compensation, job training, and other terms, conditions, and privileges of

employment."  42 U.S.C. § 12112(a).  The court analyzes ADA discrimination claims

based on circumstantial evidence under the three-step burden-shifting framework

articulated in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-05 (1973).  See

Williams v. Phila. Hous. Auth. Police Dep't, 380 F.3d 751, 759 (3d Cir. 2004); Reifer v.

Colonial Intermediate Unit 20, 462 F. Supp. 2d 621, 631-36 (M.D. Pa. 2006).  First, a

plaintiff must make out a *prima facie* case of discrimination by showing that: (1) he

or she was disabled within the meaning of the ADA; (2) he or she was qualified for

the position which he or she held; (3) he or she suffered an adverse employment

action that could give rise to an inference of willful discrimination.  Williams, 380

F.3d at 761 (citing Taylor v. Phoenixville School Dist., 184 F.3d 296, 306 (3d Cir.

1999)); see also Makky v. Chertoff, 541 F.3d 205, 214 (3d Cir. 2008); Reifer, 462 F. Supp. 2d at 631-34.

Once the plaintiff establishes a *prima facie* case, the burden shifts to the defendant to articulate one or more legitimate, nondiscriminatory reasons for its employment decision. See McDonnell Douglas, 411 U.S. at 802; Shaner v. Synthes, 204 F.3d 494, 499 (3d Cir. 2000) (quoting Jones v. School Dist. of Phila., 198 F.3d 403, 410 (3d Cir. 1999); Reifer, 462 F. Supp. 2d at 634-35. This burden is one of production, not persuasion, and requires an employer to submit evidence which, presumed true, permits the conclusion that there was a legitimate and nondiscriminatory reason for its adverse employment action. Burger v. Sec'y of Revenue *ex rel.* Pa. Dep't of Revenue, 575 F. App'x 65, 68 (3d Cir. 2014) (citing Fuentes, 32 F.3d at 763). Finally, the plaintiff must prove by a preponderance of the evidence that the defendant's articulated reasons for its employment decision were merely pretext for discrimination. See McDonnell Douglas, 411 U.S. at 804-05; St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 507-08 (1993); Fuentes v. Perskie, 32 F.3d 759, 762 (3d Cir. 1994).

The court begins by addressing the first two elements of the McDonnell Douglas analysis. For purposes of this motion, Arnold Logistics concedes that Proudfoot has established a *prima facie* case of discrimination: he is disabled insofar as he suffers from a learning disability and from Adult Separation Anxiety Disorder; he was qualified to perform the functions of his job as sanitation laborer; and he suffered an adverse employment action upon being terminated. (Doc. 23 at 11); see Williams, 380 F.3d at 761. Proceeding to the second element under

McDonnell Douglas, Arnold Logistics articulates a nondiscriminatory reason for its decision to terminate Proudfoot's employment, to wit: that the threats Proudfoot allegedly made against Dobbs violated the company policy prohibiting threats of violence in the workplace. (Doc. 23 at 12); see McDonnell Douglas, 411 U.S. at 802. Proudfoot does not contest that Arnold Logistics' proffered reason meets element two of the McDonnell Douglas burden-shifting paradigm. (See Doc. 30). Hence, the court is satisfied that Arnold Logistics has met its "relatively light burden" of producing a legitimate, nondiscriminatory reason in support of its decision to terminate Proudfoot. Burger, 575 F. App'x at 68 (quoting Fuentes, 32 F.3d at 763).

The court turns its focus to the third and final step of the burden-shifting analysis, wherein Proudfoot is tasked with showing, by a preponderance of the evidence, that Arnold Logistics' articulated reason for terminating him was merely a pretext for disability discrimination. See McDonnell Douglas, 411 U.S. at 804-05; Hicks, 509 U.S. at 507-08; Fuentes, 32 F.3d at 762. A plaintiff must prove pretext by presenting evidence from which a reasonable factfinder could "either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Keller v. Orix Credit Alliance, 130 F.3d 1101, 1108 (3d Cir. 1997) (citing Fuentes, 32 F.3d at 763). Proving pretext places a "difficult burden" on the plaintiff. Pamintuan v. Nanticoke Mem'l Hosp., 192 F.3d 378, 386 (3d Cir. 1999) (quoting Fuentes, 32 F.3d at 765).

Arnold Logistics asserts that Proudfoot has not carried this burden. Specifically, Arnold Logistics argues that Proudfoot fails to demonstrate "that the

decision to terminate his employment was for any reason other than the [alleged] threat" and contends that Proudfoot relies on mere speculation to suggest that Arnold Logistics acted with discriminatory intent. (Doc. 23 at 14-15). For the reasons set forth herein, the court agrees that Proudfoot has failed to adduce evidence from which a reasonable factfinder could either (1) disbelieve Arnold Logistics' articulated reason for terminating Proudfoot's employment or (2) find that disability discrimination was more likely than not a motivating factor in Arnold Logistics' actions.

### 1. *Credibility of Legitimate, Nondiscriminatory Reason*

To prove pretext by discrediting the employer's articulated reasons, a plaintiff must "demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them unworthy of credence and hence infer that the employer did not act for the asserted nondiscriminatory reasons." Fuentes, 32 F.3d at 765 (internal quotation marks omitted) (citing Josey v. John R. Hollingsworth Corp., 996 F.2d 632, 638 (3d Cir. 1993)); see also Ezold v. Wolf, Block, Schorr & Solis-Cohen, 983 F.2d 509, 527, 531 (3d Cir. 1992); Shaner, 204 F.3d at 501; Reifer, 462 F. Supp. 2d at 635. The plaintiff must show "not merely that the employer's proffered reason[s] [were] wrong, but that [they were] so plainly wrong that [they] cannot have been the employer's real reason[s]." Keller, 130 F.3d at 1109. To make this showing, the plaintiff may introduce evidence to show "(1) that the proffered reasons had no basis in fact[;] (2) that the proffered reasons did not actually motivate [the act;] or (3) that they were

insufficient to motivate discharge." <u>Petrikonis v. Wilkes-Barre Hosp. Co.</u>, No. 11-280, 2013 WL 5877000, at *7 (M.D. Pa. Oct. 30, 2013) (quoting <u>Harding v. CareerBuilder, LLC</u>, 168 Fed. App'x 535, 538 (3d Cir. 2006)) <u>aff'd</u>, No. 13-4403, 2014 WL 4493949 (3d Cir. Sept. 12, 2014).  The plaintiff is not required to show that the employer acted with a discriminatory purpose, <u>Sempier v. Johnson & Higgins</u>, 45 F.3d 724, 729 (3d Cir. 1995); <u>Orenge v. Veneman</u>, No. CIV-A-04-297, 2006 WL 2711651, at *14 (W.D. Pa. Sept. 20, 2006), nor is the plaintiff required to present any additional evidence beyond his or her *prima facie* case.  <u>Fuentes</u>, 32 F.3d at 764; <u>Orenge</u>, 2006 WL 2711651, at *14.

In the matter before the court, Proudfoot attempts to discredit Arnold Logistics' proffered nondiscriminatory reason by pointing to "disputes of material fact [in the record] with respect to who made the ultimate decision to terminate [Proudfoot] and the reasons for his termination."  (Doc. 30 at 11).  Proudfoot's first argument—regarding the question of who made the termination decision—misses the mark entirely.  Both Kay and Danner testified that the decision to terminate Proudfoot's employment was collaborative.  (Kay Dep. 9:16-9:23; Danner Dep. 12:5-12:10).  Kay further asserted that she made the final decision.  (Kay Dep. 9:16-9:23).  As Arnold Logistics observes, whether the ultimate decision was reached by Danner and Kay cooperatively, by Kay with input from Danner, or by Kay alone is a question of semantics.  (<u>See</u> Doc. 32 at 4).  It has no bearing on the validity of the articulated reason for terminating Proudfoot's employment.  Furthermore, Proudfoot offers no explanation as to how this alleged inconsistency in the record

discredits Arnold Logistics' proffered reason.  (See Doc. 30 at 11).  Hence, Proudfoot

fails to prove pretext on this theory.

Second, Proudfoot endeavors to cast doubt on Arnold Logistics' articulated

nondiscriminatory reason by drawing attention to a discrepancy between its filings

with the PHRC and its averments in the instant case.  In its September 27, 2012

letter to the PHRC, Arnold Logistics states that it "took [the incident involving

Haskins] into account" when making its decision to terminate Proudfoot's

employment.  (Letter to PHRC at 4).  Additionally, Arnold Logistics represented in

Proudfoot's discharge letter that the accusation of threats "combined with the

recent situation in which [Proudfoot] made a female warehouse worker

uncomfortable led to the . . . decision to end the employment relationship."  (See

Kay Dep. Ex. J at 3).  However, both Danner and Kay testified in their depositions

that the alleged threats constituted the *sole* reason for Proudfoot's termination.

(Doc. 24 ¶¶ 27, 34; Doc. 31 ¶¶ 27, 34; Danner Dep. 14:15-14:21; Kay Dep. 11:3-11:8).

Arnold Logistics replies that "[i]n response to the investigation conducted by

the [PHRC,] . . . [it merely] set forth the historical fact that [Proudfoot] was the

subject of a complaint from another coworker that did not result in discipline."

(Doc. 32 at 7).  Arnold Logistics further contends that Proudfoot fails to explain

"why this [alleged discrepancy] could create a genuine issue of material fact

suffic[ient] to establish pretext."  (Doc. 32 at 5).  On the present record, the court

must agree.

The discrepancy identified in the evidence of record calls into question

Arnold Logistics' averment that the alleged threats were the *exclusive* reason for its

decision to terminate Proudfoot's employment.  It does not, however, undermine the legitimate, nondiscriminatory reason proffered by Arnold Logistics for Proudfoot's termination.  Even if, as Proudfoot suggests, Arnold Logistics considered the incident involving Haskins when making its decision to discharge Proudfoot, Arnold Logistics' assertion that it was motivated by Proudfoot's alleged threats is no less believable.  Considered from the perspective of a reasonable factfinder, it is entirely plausible that a company contemplating the discharge of an employee would take into account all complaints previously filed against that employee.  It follows that the discrepancy highlighted herein by Proudfoot does not raise the inference that Arnold Logistics' articulated reason for terminating Proudfoot is a mere pretext.  Stated differently, Proudfoot fails to introduce evidence to show "(1) that the proffered reasons had no basis in fact[;] (2) that the proffered reasons did not actually motivate [the act;] or (3) that they were insufficient to motivate discharge."  Petrikonis, 2013 WL 5877000, at *7 (quoting Harding, 168 Fed. App'x at 538).  The court thus concludes that Proudfoot does not adequately demonstrate weaknesses, contradictions, or inconsistencies in Arnold Logistics' proffered reason for termination.  See Fuentes, 32 F.3d at 765 (citing Josey, 996 F.2d at 638); Ezold, 983 F.2d at 527, 531; Shaner, 204 F.3d at 501; Reifer, 462 F. Supp. 2d at 635.

Proudfoot also contends that he did not threaten Dobbs at any point during his conversations with Cooper; although Proudfoot does not raise this issue in his opposition papers, it appears at multiple locations throughout the record.  (See Doc. 31 ¶ 28; Proudfoot Dep. 28:19-29:24, 30:14-31:10; Kay Dep. Ex. E at 2 (Kay's interview

notes)).  He posits that Cooper's accusations were fabricated.  (Proudfoot Dep. 30:1-31:10).  In support of this contention, Proudfoot avers that Cooper "helped find a way to get [him] terminated" and that "the boss[es] [had] their favorites." (Proudfoot Dep. 65:6-65:8, 66:14-67:8).  Exercising abundant caution, the court will address these arguments to the extent they could be posed as evidence that weakens or discredits Arnold Logistics' legitimate, nondiscriminatory reason for terminating Proudfoot's employment.

In <u>Cleary v. CBRL Group</u>, No. 3:05-CV-02246, 2007 WL 2212846 (M.D. Pa. July 31, 2007), the plaintiff alleged that his employer improperly reached its decision to terminate his employment by crediting false complaints of sexual harassment made against him by co-workers.  <u>Id.</u> at *7.  The plaintiff relied on this argument to prove pretext under <u>McDonnell Douglas</u>, contending that the falsity of his co-workers' sexual harassment claims discredited his employer's articulated nondiscriminatory reason.  <u>Id.</u>  The court rejected this argument outright, explaining that "the issue is not the wisdom or competency of the defendant's decision to fire plaintiff.  Instead, the issue is whether a discriminatory animus motivated [the defendant]."  <u>Id.</u>  The plaintiff's contention that the allegations of sexual assault were false, even taken as correct, did not constitute evidence tending to disprove the employer's proffered motive for terminating his employment.  <u>Id.</u>  Thus, the plaintiff failed to establish pretext.  <u>Id.</u>

Courts within the Third Circuit have held that when co-worker complaints prompt adverse employment action, "[i]t is not the veracity of [the] allegations . . . which is at issue, but rather the integrity of [the employer's] decision-making

16

process." Ade v. KidsPeace Corp., 698 F. Supp. 2d 501, 517 (E.D. Pa.) (internal quotation marks omitted) aff'd, 401 F. App'x 697 (3d Cir. 2010); see also Cleary, 2007 WL 2212846, at *7; Jackson v. Bob Evans - Columbus, No. 2:04CV559, 2006 WL 3814099, at *8-9 (W.D. Pa. Dec. 22, 2006).  Without evidence of bad faith, courts will not second guess an employer's evaluation methods.  See, e.g., Kautz v. Met-Pro Corp., 412 F.3d 463, 471 (3d Cir. 2005) ("Evidence that the method of evaluation . . . was not the best method does not amount to evidence that the method was . . . pretext."); Ade, 698 F. Supp. 2d at 519 ("While [the employer] could have conducted a more rigorous interview of [the] plaintiff, and obtained more than a simple denial of the allegations from him, its failure to do so does not lead to the conclusion that [the employer's] articulated reason for terminating him was pretextual."); Jackson, 2006 WL 3814099, at *8 ("A mistaken but good faith disciplinary decision does not give rise to an inference of discrimination without some showing that the decision was based on [the plaintiff's protected trait].").

Proudfoot's averment that he did not threaten Dobbs during his conversation with Cooper, even if true, does not demonstrate "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in Arnold Logistics' proffered reason for terminating Proudfoot's employment.  Fuentes, 32 F.3d at 765.  Rather, it is consistent with Arnold Logistics' explanation that it based its decision on a good faith investigation of Cooper's report.  Additionally, Arnold Logistics provides evidence that prior to the incident involving Proudfoot, it terminated another employee for violating its anti-threat policy.  (Doc. 24 ¶ 35; Letter to PHRC at 5; Letter to PHRC Ex. H at 1 (Damien Tippet's discharge letter)).  The record does not

indicate whether the employee was disabled.  Assuming *arguendo* that Arnold

Logistics endeavors to maintain a work environment free of violence, and that in

pursuit of this goal it is quick to terminate employees who are accused of

threatening other employees, without more, does not lead to an inference of pretext.

Pretext does not arise solely from imprecise evaluation methods.  Ultimately, as in

Cleary, 2007 WL 2212846, at *7, there is no evidence in the record that Arnold

Logistics' investigation of Cooper's complaint against Proudfoot was conducted in

bad faith.  Accordingly, Proudfoot's claims that he did not threaten Dobbs do not

reasonably permit the conclusion that Arnold Logistics' proffered reason for

termination is pretextual.

### 2.    *Proof of Discriminatory Animus*

To prove pretext using the second available method, Fuentes, 32 F.3d at 763,

a plaintiff must "show that discrimination was more likely than not a cause for the

employer's action . . . [by] point[ing] to evidence with sufficient probative force that

a factfinder could conclude by a preponderance of the evidence that [the plaintiff's

disability] was a motivating or determinative factor in the employment decision."

Simpson v. Kay Jewelers, Div. of Sterling, Inc., 142 F.3d 639, 644-45 (3d Cir. 1998)

(citing Keller, 130 F.3d at 1111).  For example, the plaintiff may present evidence

that (1) the plaintiff has previously been discriminated against by the employer; (2)

the employer has discriminated against other persons with disabilities; or (3) the

employer has treated similarly situated persons without a disability more favorably.

Simpson, 142 F.3d at 645; Burda v. Pa. Dep't of Corr., No. 4:11-CV-0500, 2013 WL

393443, at *6 (M.D. Pa. Jan. 4, 2013) <u>adopted by</u>, No. 4:11-CV-500, 2013 WL 393398 (M.D. Pa. Jan. 31, 2013) <u>aff'd</u>, 545 F. App'x 181 (3d Cir. 2013).

Proudfoot attempts a showing of discriminatory animus by making two relevant assertions.[2]  Proudfoot first contends that "[t]he temporal proximity between [Proudfoot] alerting [Arnold Logistics] of his disability and his [date of] termination is unusually and highly suggestive." (Doc. 30 at 11).  Next, Proudfoot cites to his own deposition to allege that "the utterly ignorant and horrific comments he was subjected to" by his co-workers evidence bad faith on the part of Arnold Logistics.  The court will address each argument in turn.

Proudfoot alleges that the temporal proximity between the date he initially informed Arnold Logistics of his learning disability—February 28, 2012—and the date of his termination—March 16, 2012—creates an inference of discriminatory intent.  (Doc. 30 at 11).  It is well-established that "[t]he timing of an employee's dismissal may raise an inference that an employer's purported reasons for terminating him were pretextual."  <u>Josey</u>, 996 F.2d at 639.  The weight of temporal

---

[2] Proudfoot additionally argues that disputes of material fact exist "as to whether employees in the company regarded [Proudfoot] as disabled." (Doc. 30 at 12).  Proudfoot cites to the deposition of his co-worker, Haas, in support of this assertion. (Doc. 30 at 12; Doc. 31 ¶¶ 36-37; Haas Dep. 17:10-17:17).  In response, Arnold Logistics argues that this issue—the "existence and knowledge of a disability[—]goes to the first prong of the <u>McDonnell Douglas</u> *prima facie* case" and notes that "for summary judgment purposes [Arnold Logistics] has *not* contested either disability or knowledge." (Doc. 32 at 8-9).  The court is compelled to agree that Proudfoot's argument is inapposite at this stage of the <u>McDonnell Douglas</u> analysis.  <u>See</u>, <u>e.g.</u>, <u>Williams</u>, 380 F.3d at 761, 766 (stating that a *prima facie* claim of disability discrimination requires a plaintiff to establish that they are "disabled . . . within the meaning of the ADA," which may be accomplished by showing that they are "regarded as having a disability" by their employer (internal quotation marks omitted)).  As a result, the court cannot address the issue of pretext under this theory.

evidence is context-specific and "must be considered with a careful eye to the specific facts and circumstances encountered." Farrell v. Planters Lifesavers Co., 206 F.3d 271, 279 (3d Cir. 2000); see also Krouse v. Am. Sterilizer Co., 126 F.3d 494, 503 (3d Cir. 1997) ("Even if timing alone could ever be sufficient to establish a causal link, we believe that the timing of the alleged retaliatory action must be unusually suggestive of retaliatory motive before a causal link will be inferred." (internal quotation marks omitted)).  In Jalil v. Avdel Corp., 873 F.2d 701 (3d Cir. 1989), the plaintiff employee was terminated a mere two days after filing a complaint of discrimination with the EEOC. Id. at 708.  The Third Circuit held that on these unusually suggestive facts, temporal proximity alone provided sufficient evidence to establish the employer's discriminatory intent.  Id.

In the instant case, less than three weeks passed between the date Proudfoot filed a written statement which included a direct reference to his learning disability, (Doc. 24 ¶ 18; Doc. 31 ¶ 18; Proudfoot Dep. Ex. 1 at 1), and the date his employment was terminated.  (Proudfoot Dep. 36:13-38:2).  Nonetheless, contrary to Jalil, 873 F.2d at 708, Proudfoot's assertions regarding evidence of temporal proximity are insufficient to prove that discrimination was a determinative factor in Arnold Logistics' decision to terminate Proudfoot's employment.  Although the two events that Proudfoot highlights were undeniably close in proximity, the critical episode that allegedly precipitated Proudfoot's termination occurred in the intervening period, between the two relevant dates.  Discriminatory animus may only be inferred from temporal proximity when the evidence presented is "unusually suggestive" based upon the specific facts of the case.  Krouse, 126 F.3d at 503; see

also Farrell, 206 F.3d at 279; Jalil, 873 F.2d at 708.  If, for example, Cooper had

accused Proudfoot of threatening Dobbs weeks or months prior to the dates at

issue, Proudfoot's evidence of temporal proximity may carry some weight.  The

chronological sequence of events on record, however, does not raise an inference of

pretext.  Thus, the court holds that a reasonable factfinder could not conclude

based upon Proudfoot's argument of temporal proximity that disability

discrimination was more likely than not a motivating factor in Arnold Logistics'

actions.

Lastly, Proudfoot endeavors to demonstrate Arnold Logistics' discriminatory

purpose by introducing evidence of harassing remarks made by his co-workers.

(Doc. 30 at 12).  Courts have routinely held that an "employer's treatment of the

plaintiff may be relevant to a showing of pretext."  Josey, 996 F.2d at 639 (citing

McDonnell Douglas, 411 U.S. at 804).  In order for previous episodes of

mistreatment or harassment to create an inference of discrimination, the

individuals who perpetrated the prior acts must have had some level of involvement

in the adverse employment action at issue.  See Ezold, 983 F.2d at 545 ("Stray

remarks [of a discriminatory nature made] by non-decisionmakers or by

decisionmakers unrelated to the decision process are rarely given great weight.");

Drwal v. Borough of West View, Pa., 617 F. Supp. 2d 397, 417 (W.D. Pa. 2009)

(finding that a discriminatory remark was "not probative evidence of discriminatory

intent" because the speaker "was not a decisionmaker within the hierarchy" of the

organization, and the remark was "not related to the adverse employment actions

alleged"); cf. Josey, 996 F.2d at 641 (finding that the district court improperly failed

to "explore the decision-making structure of the company" before holding that harassment by co-workers was unrelated to the termination decision).

Proudfoot asserts that he suffered psychological abuse and invidious name-calling at the hands of Dobbs, a general manager who supervised Proudfoot's work. (Proudfoot Dep. 16:13-16:14; see also Doc. 31 ¶¶ 41-42). Proudfoot further avers that other co-workers teased him regularly and in a manner ostensibly intended to exploit his disabilities. (Proudfoot Dep. 49:15-50:22, 52:17-54:6, 59:1-59:6; see also Doc. 31 ¶ 40). Assuming arguendo that these examples of harassment are severe enough to give rise to an inference of discrimination, see, e.g., Drwal, 617 F. Supp. 2d at 417 ("Occasional insults, teasing, or episodic instances of ridicule are not enough [to create an inference of discrimination.]"), they do not demonstrate discriminatory intent on the part of Arnold Logistics; quite simply, none of the employees who allegedly harassed Proudfoot were involved in the decision-making process that led Arnold Logistics to terminate his employment. (Doc. 24 ¶ 27; Doc. 31 ¶ 27; Doc. 34 ¶¶ 2-3). Even Dobbs, a general manager, was wholly disconnected from the decision-making process that ultimately led Kay and Danner to terminate Proudfoot. (Id.) Without evidence that at least one of Proudfoot's allegedly abusive co-workers played a role in the decisive events leading up to Proudfoot's discharge, see Ezold, 983 F.2d at 545; Drwal, 617 F. Supp. 2d at 417, Proudfoot's final argument cannot establish discriminatory animus.

In sum, Proudfoot attempts to prove pretext by asserting that: (1) a dispute of material fact exists as to who made the ultimate decision to terminate him; (2) when Arnold Logistics decided to terminate him, it considered the incident involving

Haskins in addition to the threats alleged by Cooper; (3) Proudfoot did not actually

threaten Dobbs; (4) Proudfoot's co-workers may have regarded him as disabled; (5)

Proudfoot was discharged shortly after informing Arnold Logistics of his learning

disability; and (6) Proudfoot was harassed by co-workers, including general

manager Dobbs.  As explained in detail *supra*, a rational jury, assessing the

evidence presented by Proudfoot in support of these assertions, could not conclude

by a preponderance of the evidence that Arnold Logistics' proffered

nondiscriminatory reason for terminating Proudfoot is "unworthy of credence,"

<u>Fuentes</u>, 32 F.3d at 765, or that disability discrimination "was more likely than not a

. . . determinative cause of" Proudfoot's termination.  <u>Id.</u> at 764; <u>Anderson v.

Wachovia Mortgage Corp.</u>, 621 F.3d 261, 279 (3d Cir. 2010).  Accordingly, Arnold

Logistics' motion for summary judgment will be granted with respect to the

disability discrimination claim.

    **B.**    **Retaliation**

    Proudfoot alleges that he engaged in a protected activity when he filed a

written statement with HR complaining of harassment by his co-workers based on

his disabilities.  He makes no particularized assertions in support of his retaliation

claim, incorporating by reference all allegations made in support of his disability

discrimination claim.  (<u>See</u> Doc. 1 ¶¶ 42-45).

    To state a *prima facie* claim of retaliation, a plaintiff must allege that: (1) he

or she engaged in a protected activity; (2) the employer subjected him or her to an

adverse employment action; and (3) "a causal connection [existed] between the

employee's protected activity and the employer's adverse action."  <u>Williams</u>, 380

F.3d at 759; see also Aguiar v. Morgan Corp., 27 F. App'x 110, 112 (3d Cir. 2002);

Reifer, 462 F. Supp. 2d at 639.  If the plaintiff establishes a *prima facie* case of

retaliation, the McDonnell Douglas burden-shifting paradigm applies: " '[T]he

burden shifts to the employer to advance a legitimate, non-retaliatory reason for its

adverse employment action.'  If the employer satisfies that burden, the plaintiff

must then prove that 'retaliatory animus played a role in the employer's

decisionmaking process and that it had a determinative effect on the outcome of

that process.' "  Shellenberger v. Summit Bancorp, Inc., 318 F.3d 183, 571 (3d

Cir.  2003) (citing McDonnell Douglas, 411 U.S. 792).

    In the matter *sub judice*, assuming *arguendo* that Proudfoot's act of filing a

written statement with HR complaining of co-worker harassment constitutes a

protected activity, (Proudfoot Dep. Ex. 2 at 1), Proudfoot's retaliation claim fails for

lack of evidence that this protected action prompted his termination.  Arnold

Logistics assumes for purposes of summary judgment that Proudfoot can establish

a *prima facie* case of retaliation, satisfying the first prong of the McDonnell Douglas

burden-shifting framework.  (Doc. 23 at 17).  Arnold Logistics avers, however, that

Proudfoot fails to advance "credible material admissible evidence to show that his

discharge was a pretext for asking for the 'harassment and teasing' to stop[,] rather

than the threat[] relied on by Ms. Kay."  (Id.)  Without presenting any evidence in

support of his claim of retaliation, Proudfoot can neither discredit Arnold Logistics'

legitimate, nondiscriminatory reason for terminating his employment nor

demonstrate that retaliation was a motivating or determinative factor in Arnold

Logistics' decision.

In an abundance of caution, the court notes that to the extent Proudfoot might have raised an argument of temporal proximity to discredit Arnold Logistics' proffered non-retaliatory reason for his termination, such an argument would be unavailing.  Proudfoot filed his written statement with HR on March 14, 2012. (Proudfoot Dep. Ex. 2 at 1).  Therein, he stated: "It's simple.  I am tired of the teasing and harassment and I request for it to stop!!"  (Id.)  Two days later, on March 16, 2012, Arnold Logistics terminated Proudfoot's employment.  (Proudfoot Dep. 36:13-38:2).

Although Proudfoot was discharged almost immediately after he filed his complaint with HR, this close temporal proximity is not "unusually suggestive" given the context of the case.  Krouse, 126 F.3d at 503; see also Farrell, 206 F.3d at 279; Jalil, 873 F.2d at 708.  Namely, Cooper's accusation that Proudfoot threatened Dobbs triggered the occurrence of both relevant events.  Therefore, it is unsurprising that the incidents germane to Proudfoot's retaliation claim transpired in such quick succession.  On the present record, the temporal proximity evidence supportive of Proudfoot's retaliation claim, without more, is insufficient to discredit Arnold Logistics' legitimate, nondiscriminatory reason for terminating Proudfoot's employment.

Proudfoot's retaliation claim fails for the same reason as his disability discrimination claim: he has neither meaningfully discredited Arnold Logistics' proffered nondiscriminatory reason for terminating his employment nor demonstrated that retaliation was a motivating cause of Arnold Logistics' adverse action.  The court holds that a reasonable factfinder, considering the evidence of

retaliation presented by Proudfoot, could not conclude that Arnold Logistics' stated

reason for terminating Proudfoot's employment is "unworthy of credence,"

Fuentes, 32 F.3d at 765, or that retaliation was more likely than not a deciding factor

in Proudfoot's termination.  Id. at 764; Anderson, 621 F.3d at 279.  As a result,

Arnold Logistics' motion for summary judgment will also be granted with respect to

the retaliation claim.

IV.   **Conclusion**

For all of the foregoing reasons, Arnold Logistics' motion (Doc. 22) will be

granted.  An appropriate order will issue.


/S/ CHRISTOPHER C. CONNER
Christopher C. Conner, Chief Judge
United States District Court
Middle District of Pennsylvania


Dated:      November 10, 2014